# No. 19-3204

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

DONALD J. TRUMP,

Plaintiff-Appellant,

v.

CYRUS R. VANCE, JR., in his official capacity as District Attorney
of the County of New York, and MAZARS USA, LLP,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

JOSEPH H. HUNT
*Assistant Attorney General*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SCOTT R. MCINTOSH
GERARD SINZDAK
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0718*

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT ...............1

ARGUMENT ...................................................................................................5

I. Subjecting The President To State Criminal Process Raises
Significant Constitutional Questions .........................................................5

    A. The President's office is unique in the constitutional structure ................5

    B. The Supremacy Clause bars States from interfering with
the President's discharge of his duties ..........................................7

II. The District Court Erred In Concluding That *Younger* Required It To
Abstain From Resolving The President's Suit ..........................................9

III. The District Court Erred In Upholding A State Criminal Subpoena
Demanding The President's Personal Records Without Requiring,
At A Minimum, A Heightened And Particularized Showing Of Need ..............15

    A. Article II and the Supremacy Clause preclude a State from
arresting, indicting, prosecuting, or imprisoning an incumbent
President.....................................................................16

    B. Because a state criminal subpoena seeking the President's
personal records poses a threat of unconstitutional state
interference, a state prosecutor must, at a minimum,
establish a demonstrated, specific need for the records ...........................19

    C. The District Court failed to conduct the heightened and
particularized review that the *Nixon* standard demands ...........................24

    D. This Court should stay enforcement of the subpoena as
to the President's records  ....................................................27

CONCLUSION ...........................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
    542 U.S. 367 (2004) .............................................................................5, 7, 11, 16

*Clinton v. Jones,*
    520 U.S. 681 (1997) ....................................................................... 2, 5, 6, 7, 8, 23

*Commodities Exp. Co. v. Detroit Int'l Bridge Co.,*
    695 F.3d 518 (6th Cir. 2012) .............................................................................11

*Davis v. Elmira Sav. Bank,*
    161 U.S. 275 (1896) ...........................................................................................8

*Dennis v. Higgins,*
    498 U.S. 439 (1991) .........................................................................................15

*Diamond "D" Const. Corp. v. McGowan,*
    282 F.3d 191 (2d Cir. 2002) ............................................................................10

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...........................................................................................6

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) ....................................................................................... 3, 6

*Golden States Transit Corp. v. City of Los Angeles,*
    493 U.S. 103 (1989) .........................................................................................15

*Grand Jury Subpoena, In re,*
    93 N.Y.2d 729 (1999) ......................................................................................19

*Hancock v. Train,*
    426 U.S. 167 (1976) ...........................................................................................7

*Helvering v. Davis,*
    301 U.S. 619 (1937) ...........................................................................................9

*Illinois v. Allen,*
    397 U.S. 337 (1970) .........................................................................................17

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ............................................................................13

*Kugler v. Helfant*,
   421 U.S. 117 (1975) ...........................................................................................10

*McClung v. Silliman*,
   19 U.S. (6 Wheat.) 598 (1821)..............................................................................8

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819)..........................................................................2, 7

*Mesa v. California*,
   489 U.S. 121 (1989) ...........................................................................................13

*Mitchum v. Foster*,
   407 U.S. 225 (1972) ......................................................................................12, 15

*Moore v. Sims*,
   442 U.S. 415 (1979) ...........................................................................................10

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) .............................................................2, 5, 6, 7, 11, 26

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ...........................................................................................27

*Quackenbush v. Allstate Ins. Co.*,
   517 U.S. 706 (1996) .............................................................................................9

*Sealed Case, In re*,
   121 F.3d 729 (D.C. Cir. 1997) ...................................................... 4, 20, 21, 22

*Sprint Commc'ns, Inc. v. Jacobs*,
   571 U.S. 69 (2013) .......................................................................................... 9, 10

*State of Colorado v. Symes*,
   286 U.S. 510 (1932) .............................................................................................8

*Tarble, In re*,
   80 U.S. (13 Wall.) 397 (1871) ..............................................................................8

*Tennessee v. Davis,*
  100 U.S. 257 (1880) ........................................................................8

*Trump, In re,*
  No. 19-5196, 2019 WL 3285234 (D.C. Cir. July 19, 2019) ...........14

*Trump v. Mazars USA LLP,*
  No. 19-5142, 2019 WL 5089748 (D.C. Cir. Oct. 11, 2019) ...........14

*United States v. Belmont,*
  301 U.S. 324 (1937) ........................................................................7

*United States v. Burr,*
  25 F. Cas. 187 (CC Va. 1807) ...................................................11, 22

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ....................................................................6, 17

*United States v. Gagnon,*
  470 U.S. 522 (1985) ......................................................................17

*United States v. Morton Salt Co.,*
  338 U.S. 632 (1950) ......................................................................19

*United States v. Nixon,*
  418 U.S. 683 (1974) ....................................................... 4, 21, 22, 24

*United States v. R. Enters., Inc.,*
  498 U.S. 292 (1991) ..................................................................18, 19

*Virag v. Hynes,*
  54 N.Y.2d 437 (1981) .....................................................................20

*Younger v. Harris,*
  401 U.S. 37 (1971) ......................................................................3, 10

**U.S. Constitution:**

Art. I:

   § 2, cl. 5 ....................................................................................16

   § 3, cl. 6 ....................................................................................16

   § 3, cl. 7 ....................................................................................16

   § 4 ..............................................................................................6

   § 5 ..............................................................................................6

Art. II:

   § 1 ..............................................................................................2

   § 2 ..............................................................................................6

Art. VI, cl. 2 (Supremacy Clause) ............................................7

**Statutes:**

Anti-Injunction Act,
   28 U.S.C. § 2283 ....................................................................12

28 U.S.C. § 1442(a)(1) ................................................................13

42 U.S.C. § 1983 ..................................................................12, 15

**Other Authorities:**

*A Sitting President's Amenability to Indictment & Criminal Prosecution*,
   24 U.S. Op. Off. Legal Counsel 222 (2000) ...................16, 17, 18

Memorandum for the U.S. Concerning the Vice President's Claim of Constitutional
   Immunity, *In re Proceedings of the Grand Jury Impaneled Dec. 5, 1972*, No. 73-cv-965
   (D. Md. Oct. 5, 1973) ............................................................16

William J. Stuntz, *The Pathological Politics of Criminal Law*,
   100 Mich. L.R. 505, 533 (2001) ..............................................8

**INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT**

This case involves the first attempt in our Nation's history by a local prosecutor to subpoena personal records of the sitting President of the United States. President Trump, in his individual capacity, filed suit in federal district court against the District Attorney for the County of New York—as well as the accounting firm that received the subpoena—seeking emergency relief from the subpoena under Article II and the Supremacy Clause.

The district court denied the President's request for relief and dismissed his suit. The court concluded that it was obligated to abstain from considering a federal constitutional challenge to a state grand jury subpoena even at the behest of the President asserting Article II prerogatives. In the alternative, the court rejected the President's challenge to the subpoena on the merits, giving essentially dispositive weight to its view that the President's tax returns and other personal financial records may be relevant to the District Attorney's investigation of third parties beyond the President. The United States files this brief as amicus curiae because the court's procedural and substantive holdings reflect a fundamental misunderstanding of the relationship between the President and the state criminal process under our constitutional system of federalism.[1]

---

[1] The United States has previously participated in cases that have presented other issues concerning the President's amenability to suit or compulsory process. *See, e.g.*, *Trump v. Deutsche Bank AG*, No. 19-1540 (2d Cir.) (Aug. 19, 2019) (whether a

As an overarching matter, any assertion of state criminal jurisdiction over the President raises significant constitutional issues. The President occupies a "unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). He alone is vested with "[t]he executive Power" of the United States, U.S. Const. art. II, § 1, along with the myriad duties in the conduct of domestic and foreign affairs that are assigned to him by Article II. State criminal process directed at him and his personal records risks compromising his discharge of those constitutionally mandated powers and duties. It also raises serious issues under the Supremacy Clause, which prohibits states from interfering with the operations of the federal government without consent. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). The structure of state criminal justice systems, which place prosecutorial authority in the hands of thousands of elected local officials, enhances the risk that a state official will prioritize local concerns and disregard the burdens on federal interests imposed by a grand jury subpoena directed at the President's personal records. In light of these principles, expanded upon below, the district court erred both in refusing to exercise jurisdiction and in declining to halt the District Attorney's enforcement of the subpoena against the President's personal records.

---

congressional subpoena seeking the President's personal financial records from a third-party custodian is enforceable); *Clinton v. Jones*, 520 U.S. 681 (1997) (whether civil litigation in federal court against the President for pre-tenure conduct may proceed during his tenure); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) (whether the President is immune from civil actions for damages based on official conduct).

First, when a sitting President invokes the jurisdiction of a federal court to challenge a state grand jury subpoena on federal constitutional grounds, a federal court must resolve that challenge. Contrary to the district court's conclusion, the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), does not require a federal court to refrain from exercising jurisdiction. The comity interests underlying that doctrine must give way to the concerns under Article II and the Supremacy Clause posed by a state grand jury subpoena that demands the sitting President's personal records.

Second, Article II and the Supremacy Clause constrain a State's ability to invoke its criminal process against a sitting President. A State plainly could not arrest or imprison a President during his term of office, which would incapacitate the single officer in whom the executive power of the United States is vested. Even without such detention, a state criminal indictment and prosecution would subject the President to burdens that would impermissibly "impair [the Chief Executive] in the performance of his constitutional duties." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 500 (2010). Recognition of these principles does not place the President above the law; it merely postpones initiation of any potential criminal prosecution until his term of office ends.

In light of these profound Article II and federalism concerns, a federal court must, at a minimum, require a heightened, particularized showing for any state criminal subpoena for a President's personal records. It is well established that, where

a federal prosecutor or grand jury seeks privileged information from the President, a "demonstrated, specific need" for the records requested must be established. *United States v. Nixon*, 418 U.S. 683, 713 (1974); *In re Sealed Case*, 121 F.3d 729, 755 (D.C. Cir. 1997). It must be shown that the requested material is "essential" to the proceeding, *Nixon*, 418 U.S. at 713, and that it cannot be obtained with "due diligence" elsewhere, *In re Sealed Case*, 121 F.3d at 755. Given the threat to the operation of the Executive Branch posed by state grand jury subpoenas directed at the President and his personal records, state prosecutors should be required to make at least as rigorous a showing for all such records, privileged or not.

Although the district court purported to apply the analytic framework set forth in *Nixon*, the court's conclusory analysis falls well short of the careful scrutiny that the *Nixon* standard demands in this context. Among other things, the court failed to evaluate whether the District Attorney had demonstrated a specific and immediate need for the personal records of the President and whether any centrally important information in those records could not be obtained elsewhere. For example, although the court justified its decision to sustain the subpoena's request for the President's records primarily on the ground that the requested records "may" reveal unlawful conduct by parties other than the President, the court never explained why the immediate production of the personal records of the President was essential to the state grand jury's investigation of those third parties.

In light of the district court's failure to undertake the requisite analysis, its decision should be reversed. The court should be ordered to stay enforcement of the subpoena as to the President's personal records unless and until—at a minimum—the District Attorney is able to make the required showing of particularized need.

## ARGUMENT

### I. Subjecting The President To State Criminal Process Raises Significant Constitutional Questions

#### A. The President's office is unique in the constitutional structure

The Supreme Court has long recognized that "the high respect that is owed to the office of the Chief Executive . . . should inform the conduct of [an] entire proceeding" implicating the autonomy of his office. *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 385 (2004) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)). That respect is demanded by our constitutional design. The President occupies a "unique position in the constitutional scheme." *Fitzgerald*, 457 U.S. at 749. While the Constitution vests the legislative and judicial powers in collective bodies, it vests "[t]he executive Power" in the President alone. U.S. Cont. art. II, § 1. His office, unlike those of other executive officers, does not depend on Congress for its existence or its powers. The Constitution "entrust[s] [the President] with supervisory and policy responsibilities of utmost discretion and sensitivity." *Fitzgerald*, 457 U.S. at 750. And it is he alone "who is charged constitutionally to 'take Care that the Laws be faithfully executed.'" *Id.* Among other critical responsibilities, the President serves as

"the sole organ of the federal government in the field of international relations," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), and is the Commander-in-Chief of the military, U.S. Const. art. II, § 2.

In constitutional and practical terms, the President's power and responsibilities under Article II are "so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697. Our system of government presumes that the President will have ultimate authority over the actions of officials within the Executive Branch. *Free Enter. Fund*, 561 U.S. at 496-97. In both the demands it places on its occupant and the accountability it expects, the Presidency is a singular office. The unceasing nature of the President's duties is also reflected in the constitutional structure of his office. In contrast to the Congress, which is required to assemble only "once in every Year" (U.S. Const. art. I, § 4) and which may adjourn on a regular basis (*id.* § 5), the President must attend to his duties as Chief Executive and Commander-in-Chief continuously during his tenure.

Finally, due to the "special nature of the President's constitutional office and functions" and "the singular importance of [his] duties," the Constitution requires particular "deference and restraint" in the conduct of litigation involving the President. *Fitzgerald*, 457 U.S. at 751-56. The Supreme Court has held, for example, that a court may not enjoin the President in the conduct of his official duties and that Congress may subject the President to a statute's dictates only if it states its intention

to do so clearly. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01, 803 (1992). Concerns about the impact of litigation on the President's ability to perform his constitutional functions have likewise led the Supreme Court to hold that the President is absolutely immune from civil damages liability for his official actions, *Fitzgerald*, 457 U.S. at 756, and that he is entitled to special solicitude in discovery, *Cheney*, 542 U.S. at 385, even in suits solely related to his private conduct, *Clinton*, 520 U.S. at 707. Constitutional concerns also must guide a court's assessment of the President's entitlement to judicial review and relief. *Cheney*, 542 U.S. at 385 (concerning mandamus relief from discovery order).

## B. The Supremacy Clause bars States from interfering with the President's discharge of his duties

The Supremacy Clause, U.S. Const. Art. VI, cl. 2, mandates that "the activities of the Federal Government [be] free from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 167 (1976). As Chief Justice Marshall long ago explained, "[i]t is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *McCulloch*, 17 U.S. at 427. The Supremacy Clause thus deprives the States of power "to retard, impede, burden, or in any manner control, the operations" of the federal government in executing its constitutional functions. *Id.* at 436. Under our constitutional system, it is "inconceivable" that a state law or policy could "be interposed as an obstacle to the effective operation of a

7

federal constitutional power." *United States v. Belmont*, 301 U.S. 324, 332 (1937); *see Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896) (any attempt by a State to "control the conduct of the" national government or to "impair[] the efficiency of th[e] agencies of the federal government to discharge the[ir] duties" is "absolutely void"); *Tennessee v. Davis*, 100 U.S. 257, 263 (1880).

Those principles apply equally to a State's invocation of its judicial process. For example, as a result of the "distinct and independent character of the government of the United States," "State judges and State courts" lack authority to issue a writ of habeas corpus directing federal officers to release persons held under federal authority. *In re Tarble*, 80 U.S. (13 Wall.) 397, 407-12 (1871). So too, States lack authority to issue writs of mandamus directed at federal officers. *McClung v. Silliman*, 19 U.S. (6 Wheat.) 598, 604-05 (1821).

Congress and the Supreme Court have long recognized the deep-rooted federal interest in "safeguarding officers and others acting under federal authority against peril of punishment for violation of state law or obstruction or embarrassment by reason of opposing policy on the part of those exerting or controlling state power." *State of Colorado v. Symes*, 286 U.S. 510, 517 (1932) (discussing federal-officer removal statute). The structure of state criminal justice systems exacerbates the risk that "possible local prejudice," *Clinton*, 520 U.S. at 691, may lead state criminal investigations to interfere with locally unpopular federal authorities and priorities. There are more than 2,300 district attorneys across the United States, the vast majority

8

of whom are locally elected, often by voters in a single county. *See* William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L.R. 505, 533 (2001). In contrast to a United States Attorney, who is accountable to the Attorney General and to the President, who in turn is accountable to the Nation as a whole, a local prosecutor is accountable to a small and localized electorate. He or she is thus far more susceptible to the particularized interests and views of the local community—the same community from which the grand jury is typically drawn, and one that may strongly oppose the policies and priorities of the federal government in general and the President in particular. Moreover, even setting aside the potential for local bias, state officials are, as a structural matter, not tasked with considering the effects their actions will have on the federal government and the Nation as a whole. *Cf. Helvering v. Davis*, 301 U.S. 619, 644 (1937) (States are not likely to take action that would "serve the [national] interests of all" where doing so would "disadvantage" their citizens).

## II. The District Court Erred In Concluding That *Younger* Required It To Abstain From Resolving The President's Suit

The Supreme Court has described *Younger* abstention as an "exceptional" departure from federal courts' "virtually unflagging" "obligation" to exercise jurisdiction conferred by Congress despite the pendency of related proceedings in state court. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). Like other federal abstention doctrines, *Younger* ultimately rests on "the historic discretion exercised by federal courts 'sitting in equity.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 718

(1996).  In the case of *Younger* abstention, when a plaintiff asks a federal court to enjoin a pending state criminal proceeding, principles of "comity" and "[f]ederalism" generally call for the federal court to exercise that equitable discretion by declining to intervene.  *Younger*, 401 U.S. at 44.

But, reflecting its exceptional nature, *Younger* has important limitations.  *See Sprint Commc'ns, Inc.*, 571 U.S. at 73.  Even when a plaintiff seeks to enjoin an ongoing state criminal proceeding, "a federal court may nevertheless intervene in [the] state proceeding upon a showing of 'bad faith, harassment or any other unusual circumstance that would call for equitable relief.'"  *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (quoting *Younger*, 401 U.S. at 54); *see Kugler v. Helfant*, 421 U.S. 117, 125 (1975) (federal court may intervene when there is "an extraordinarily pressing need for immediate federal equitable relief").  Likewise, a federal court may intervene if "the state proceedings [do not] afford an adequate opportunity to raise constitutional claims."  *Moore v. Sims*, 442 U.S. 415, 430 (1979).  In each of these circumstances, principles of comity and federalism give way to countervailing considerations in the exercise of the court's equitable discretion.  So too here.

To be sure, the Supreme Court has generally described pending "state criminal prosecutions" as one of the "exceptional" circumstances in which *Younger* abstention is warranted.  *Sprint Commc'ns, Inc.*, 571 U.S. at 73.  But neither that Court nor any other has ever considered whether such abstention is warranted in the unique scenario

10

in which the President of the United States invokes a federal court's jurisdiction to challenge a state criminal subpoena, asserting claims grounded in Article II and the Supremacy Clause.  In shutting the doors of the federal courts to such a claim by the President himself, the district court erroneously extended *Younger* far into uncharted territory.

The principles of federalism and comity that undergird *Younger* abstention militate strongly in favor of ensuring that the President has a federal forum in which to litigate federal claims that a state criminal subpoena is impermissibly trenching on his constitutional role in violation of Article II and the Supremacy Clause.  Remitting the sitting President to state court would turn notions of federalism and comity on their head and would ignore the "unique position [the President occupies] in the constitutional scheme."  *Fitzgerald*, 457 U.S. at 749; *see Cheney*, 542 U.S. at 381-82 ("[I]n no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (CC Va. 1807) (Marshall, C.J.)).

Indeed, "[c]omity generally refers to the respect that [federal courts] accord a state court[,] [b]ut comity is a two-way street."  *Commodities Exp. Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 527 (6th Cir. 2012).  When a local tribunal takes the extraordinary step of issuing compulsory process for the personal records of a sitting President, comity calls for ensuring the availability of a federal forum for the President to challenge enforcement of that subpoena, particularly given that the President's

11

constitutional claims implicate the very relationship between the federal and state governments under the Supremacy Clause. And by the same token, the state's interest in litigating such an unusual dispute in a state forum is minimal.

Both the Supreme Court and Congress have recognized that the type of claims the President has raised belong in federal rather than state court. With respect to the Supreme Court, that conclusion follows from the manner in which it has interpreted the Anti-Injunction Act, 28 U.S.C. § 2283, which generally prohibits suits seeking a federal injunction against state court proceedings. The Anti-Injunction Act contains certain express exceptions, including one where, as here, the plaintiff asserts a federal constitutional claim under 42 U.S.C. § 1983 against a person acting under color of state law. *See infra* p. 15 n.2. But even where none of the Act's express exceptions apply, the Court has recognized an implied exception for suits by the federal government. *Mitchum v. Foster*, 407 U.S. 225, 235-36 & n.20 (1972). The same respect for the federal government that caused the Court to recognize an implied exception to the Act's express prohibition strongly suggests that the Court would not extend *Younger* abstention's implied limitation to the President when seeking injunctive relief against state criminal proceedings in order to vindicate the constitutional rights, privileges, and immunities of his office under Article II.

Congress, for its part, has not only authorized Section 1983 suits, but also authorized federal officers to remove from state court to federal court any "civil action or criminal prosecution . . . against or directed to . . . any officer . . . of the

United States for or relating to any act under color of such office," so long as the officer is asserting a federal defense to the action. 28 U.S.C. § 1442(a)(1); *Mesa v. California*, 489 U.S. 121, 124-25 (1989). That is important because, if the state grand jury had issued a subpoena to the President himself, the President could have taken measures enabling him to invoke Section 1442 to contest the validity of the subpoena in federal court—namely, by declining to comply on the basis of Article II and the Supremacy Clause, waiting for the commencement against him of a subpoena enforcement proceeding in state court, and then removing that proceeding under Section 1442 on the ground that the subpoena enforcement action would "relate" to his "act" of declining to comply with the subpoena "under color" of his assertion of the constitutional authority of his office.

Although the state grand jury in this matter has sought the President's records by subpoenaing his third-party accountant rather than the President himself, that is not a material distinction for purposes of *Younger* abstention. As just discussed, the President would be entitled to review in federal court if the District Attorney had sought his personal records directly from him. The President should not lose access to that federal forum simply because the President's records are sought from a third-party custodian. *Cf. Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 225 (D.C. Cir. 2013) (White House visitor records in the possession of the Secret Service are not agency records subject to FOIA.). The President has little practical choice but to rely on third-party accountants and professionals to prepare and maintain his financial

records. State criminal subpoenas directed to the President's records in the hands of such a custodian pose the same threat of distraction, harassment, and interference— and thus raise the same fundamental federalism concerns—as subpoenas issued to him personally, especially given that he would not be expected to personally compile the requested records himself regardless. *Cf. Trump v. Mazars USA LLP*, No. 19-5142, slip op. 24 (D.C. Cir. Oct. 11, 2019) (recognizing that a congressional subpoena issued to the President's accounting firm for financial documents created "in his pre-presidential, private capacities" nonetheless implicates the separation of powers); *In re Trump*, No. 19-5196, 2019 WL 3285234, at *1 (D.C. Cir. July 19, 2019) (recognizing that third-party discovery requests by Members of Congress concerning President's alleged receipt of emoluments raised separation-of-powers concerns).

The district court suggested that a federal forum might be appropriate in cases where "state prosecutors [were] more clearly target[ing the] President on politicized grounds." Op. 27 n.9. It is difficult to credit the suggestion either that the President is not a principal focus of this subpoena (even if not the sole focus) or that its subject matter is not "politicized," given that (i) the President's tax returns have been the subject of intense political controversy since he became a candidate for office, and (ii) the subpoena is, as the district court acknowledged, a virtual carbon copy of a subpoena that the Committee on Oversight and Reform of the United States House of Representatives has issued as part of a conceded investigation of the President. *See* Op. 28-29; Tr. 76-77, *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir.).

14

Moreover, the district court failed to appreciate the troubling position in which federal courts would be placed if their abstention decisions required them to determine whether there is sufficient basis to conclude that a local prosecutor is demanding the President's records for political reasons. Rather than wade into that minefield, this Court should hold that, for all the reasons above, *Younger* abstention is simply not warranted in this exceptional context.[2]

## III. The District Court Erred In Upholding A State Criminal Subpoena Demanding The President's Personal Records Without Requiring, At A Minimum, A Heightened And Particularized Showing Of Need

The unique and critical role of the President under Article II, and the relationship between the federal government and the States under the Supremacy Clause, constrain the application of state criminal processes to a sitting President. Those limits are most obvious in the context of a criminal prosecution of the

---

[2] The district court correctly concluded that the Anti-Injunction Act does not independently bar the President's suit under 42 U.S.C. § 1983. Op. 12-13 (citing *Mitchum*, 407 U.S. at 243). The President validly invoked Section 1983, as he alleges a deprivation by the District Attorney of "rights, privileges, or immunities secured by the Constitution"—specifically, a freedom from enforcement of the subpoena that the President claims Article II secures to him and him alone. Although the district court mentioned "doubts" (Op. 13 n.4) as to whether the President's asserted "rights, privileges, or immunities" are "sufficiently specific and definite" to be within "the competence of the judiciary to enforce," *Golden States Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108 (1989), Article II is no more "vague and amorphous," *id.* at 106, than other constitutional provisions enforceable through Section 1983, such as the dormant Commerce Clause, *Dennis v. Higgins*, 498 U.S. 439, 446-51 (1991).

President himself, and they must inform the proper analysis of state criminal

subpoenas demanding the President's personal records.

### A. Article II and the Supremacy Clause preclude a State from arresting, indicting, prosecuting, or imprisoning an incumbent President

Any attempt by a State to arrest, indict, prosecute, or imprison an incumbent

President in connection with a criminal prosecution would of course obstruct the

President's execution of his constitutional duties. *A Sitting President's Amenability to

Indictment & Criminal Prosecution*, 24 U.S. Op. Off. Legal Counsel 222, 247-48 (2000)

(2000 OLC Memo). Although the district court suggested that only a "lengthy"

imprisonment would necessarily interfere with the President's ability to discharge his

constitutional functions, Op. 4, that qualifier is absurd, as imprisonment of any length

would unquestionably impede the President's ability to address the unceasing

demands of his office. And the court's remarkable suggestion underscores its more

general failure to take account of "[t]he high respect that is owed to the office of the

Chief Executive." *Cheney*, 542 U.S. at 385.

Allowing a State to incapacitate a sitting President would also circumvent the

Constitution's carefully crafted impeachment process. U.S. Const. art. I, § 2, cl. 5; *id.*

§ 3, cls. 6 & 7. The Framers "assumed the nation's Chief Executive, responsible as no

other single officer for the affairs of the United States, would not be taken from

duties that only he can perform unless and until it is determined that he is to be shorn

of those duties by the Senate." Memorandum for the U.S. Concerning the Vice

President's Claim of Constitutional Immunity (Bork Memo) 17, *In re Proceedings of the Grand Jury Impaneled Dec. 5, 1972*, No. 73-cv-965 (D. Md. Oct. 5, 1973).

Even absent detention, the filing of criminal charges and the initiation of criminal proceedings against a sitting President would impermissibly interfere with the President's oversight of the Nation's affairs. "The constitutional provisions governing criminal prosecutions make clear the Framers' belief that an individual's mental and physical involvement and assistance in the preparation of his defense both before and during any criminal trial would be intense, no less so for the President than for any other defendant." 2000 OLC Memo, at 251. The Fifth and Sixth Amendments, for example, guarantee a defendant the right to be present at trial and at all other critical proceedings, to confront witnesses against him, and to the assistance of counsel (a right necessarily premised on the defendant's ability to communicate with such counsel). *See, e.g.*, *Illinois v. Allen*, 397 U.S. 337, 338 (1970); *United States v. Gagnon*, 470 U.S. 522, 526 (1985).

In short, the Constitution envisions active participation by the defendant in his defense throughout a state criminal prosecution, and the President is no different. The President's defense would "inevitably entail a considerable if not overwhelming degree of mental preoccupation." 2000 OLC Memo, at 254.

A state criminal indictment would also impose a stigma on the President that would undermine his standing and credibility both at home and abroad, impairing his role as the Nation's chief decisionmaker in domestic matters and "sole organ" in

international affairs, *Curtis-Wright*, 299 U.S. at 320. An indictment is an official pronouncement, by a public body, that there is probable cause to believe that the defendant has committed a crime. *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297-98 (1991). "Indictment alone [thus] risks visiting upon the President the disabilities that stem from the stigma and opprobrium associated with a criminal charge." 2000 OLC Memo, at 250-51.

Again exhibiting a fundamental misunderstanding of the nature of the Presidency, the district court suggested that the President would not be unduly burdened or stigmatized by a prosecution and conviction for not "very serious offenses," such as "failing to pay state taxes" or "driving while intoxicated." Op. 59-60. The suggestion that the crimes of tax evasion and driving while intoxicated are not "very serious," or that the Nation's Chief Executive would be justified in treating such charges as insignificant matters, is bizarre.

As the district court noted, the Department of Justice has previously set forth its longstanding position that a President may not be arrested, indicted, prosecuted, or imprisoned in the context of a federal criminal prosecution. Op. 48; 2000 OLC Memo., at 223 n.2. The principles that underlie the Department's longstanding position apply *a fortiori* to a State's attempt to prosecute or imprison a sitting President. And the federalism principles discussed above provide even stronger grounds for denying a State the power to arrest, indict, prosecute, or imprison an incumbent President. *See supra* Part I.B. Given that, for example, a State cannot issue

18

a writ of habeas corpus or mandamus directing even a single federal officer to take official actions, it would be perverse if a State could prosecute, much less detain, the President and thereby disable the entire Executive branch. And state interference with the federal government's operations, prohibited by the Supremacy Clause, would be at its zenith if a State elected to criminally prosecute the President.

> **B.** **Because a state criminal subpoena seeking the President's personal records poses a threat of unconstitutional state interference, a state prosecutor must, at a minimum, establish a demonstrated, specific need for the records**

**1.** Even when a State has not indicted an incumbent President, any assertion of its criminal jurisdiction over the President—including through the issuance of a grand jury subpoena seeking the President's personal records—raises profound constitutional concerns.

State grand jury demands for the President's personal records risk substantially burdening the President and diverting him from the discharge of his constitutional functions. The broad scope of a grand jury's investigatory powers could lead locally elected prosecutors to demand intrusive information from the President. A grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurances that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–643 (1950). "As a necessary consequence of its investigatory function, the grand jury paints with a broad brush." *R. Enterprises*, 498 U.S. at 297; *see also In re Grand Jury Subpoena*, 93 N.Y.2d 729, 740 (1999). In New York, "given the ranging,

exploratory nature and operation of a Grand Jury," a witness who seeks to quash a subpoena "must demonstrate 'that a particular category of documents can have no conceivable relevance to any legitimate object of investigation by the . . . grand jury.'" *Virag v. Hynes*, 54 N.Y.2d 437, 444 (1981).

The "necessary breadth of grand jury's inquiries," *In re Sealed Case*, 121 F.3d at 756, means that state grand jury subpoenas could impose substantial burdens on the President's time, attention, and discharge of his constitutional duties. This could occur when the President is merely a third party from whom a state grand jury seeks to obtain testimony or evidence that is remotely or tangentially related to the matter under investigation. And the risk is particularly serious if the President is himself a potential focus of the grand jury's investigation. Just as an indictment and prosecution could be expected to divert the President's attention and energy from his official duties to his personal legal jeopardy, a demand for the President's own records will necessarily be a distraction when the President himself is a possible focus of the criminal investigation. *See supra* pp. 13-14 (explaining that subpoenaing a third-party custodian of the President's records does not eliminate the burdens on the President himself).

As discussed (*supra* Part I.B), the structural incentive of locally elected prosecutors to prioritize local concerns poses a serious risk that a local grand jury or prosecutor may subject the President to demands that impermissibly burden his performance of his unique and critical constitutional responsibilities. At a minimum,

20

state prosecutors are ill positioned to place significant weight on the impact of their local decisions on the functioning of the federal government. By contrast, structural features of the federal criminal justice system, including the important role played in grand jury proceedings by federal prosecutors within the Department of Justice, mitigate the risk that federal grand juries will subject a sitting President to inappropriately disruptive investigatory demands. When considering whether to subpoena the President's personal records, federal prosecutors are uniquely positioned to evaluate and take account of both the benefits and burdens of such an extraordinary demand. State prosecutors are not.

**2.** It is unprecedented for a sitting President's personal records to be a subject of a state criminal subpoena. And in the rare instances where courts have addressed a federal criminal subpoena that has sought the President's records, they have not done so in connection with an investigation that squarely focused on the President in whole or in part. *See, e.g.*, *Nixon*, 418 U.S. at 687-89 (subpoena sought records from the President, who was not indicted, in connection with the trial of six other individuals). Yet even in those instances, courts have demanded that the federal prosecutors who sought the President's privileged records make a heightened and particularized showing of need for the documents' production. *See id.* at 713 ("demonstrated, specific need"); *In re Sealed Case*, 121 F.3d at 754. Given the unprecedented nature of the District Attorney's actions in this case and the unique constitutional concerns that those actions raise, the District Attorney must at a minimum meet the heightened

requirements set forth in *Nixon* before obtaining the President's personal records, whether privileged or not.

In concluding that the standard "govern[ing] grand jury subpoenas is no more lenient than the need standard enunciated for trial subpoenas in *Nixon*," the D.C. Circuit explained that "*Nixon*'s demonstrated, specific need standard has two components." *In re Sealed Case*, 121 F.3d at 754, 756. First, elaborating on *Nixon*'s requirement that "the Presidential material [be] 'essential to the justice of'" the case, 418 U.S. at 713 (quoting *Burr*, 25 F. Cas. at 192), the court stated that the "evidence sought must be directly relevant to issues that are expected to be central" to the jury's decision to indict. *In re Sealed Case*, 121 F.3d at 754. And in considering whether a prosecutor has made the requisite showing of a vital need for the production of the President's records, a court must evaluate the need for *immediate* production, as opposed to after the President leaves office. Second, a prosecutor must also demonstrate that the evidence specifically requested and immediately needed "is not available with due diligence elsewhere." *Id.* at 755. This requirement "reflects *Nixon*'s insistence" that presidential materials "should not be treated as just another source of information." *Id.* A subpoena directed at a President's records should be permitted only "as a last resort." *Id.* at 761.

To be sure, the Supreme Court in *Nixon* articulated the foregoing requirements in response to the separation-of-powers concerns with disrupting the functioning of the Executive Branch when a *federal* prosecutor seeks to compel the President to

produce *privileged* communications. *See* 418 U.S. at 707-08. But the need to protect the President from the disruption risked by intrusive and burdensome demands for information is at least as pressing in the context of a *State's* criminal demand for a President's *personal* records. As discussed, the constitutional framework created by the Supremacy Clause prohibits a State from interfering with the federal government's functions absent its consent. *See supra* Part I.B. The heightened standards set forth in *Nixon* as a means of minimizing interference with the President's constitutional functions are no less appropriate—and indeed may be even more necessary—to protect those functions from unwarranted demands for the President's personal records by state criminal investigations, whether deliberate or inadvertent.

The district court emphasized the statement in *Clinton v. Jones* that the Supreme Court had "never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity." Op. 69 (quoting 520 U.S. at 694). But the district court overread this statement. *Clinton* also emphasized that an "immunity's justifying purposes" define the "sphere of protected action." 520 U.S. at 694. Thus, while *Clinton* permitted a federal court action for the President's private conduct to go forward, the Court expressly acknowledged that a different rule might apply to actions brought in state court, given the "federalism and comity concerns" such a suit would raise and "the interest in protecting federal officials from possible local prejudice." *Id.* at 691. At a minimum, those interests

23

justify applying *Nixon*'s heightened standard to a local subpoena demanding the President's personal records.

### C. The District Court failed to conduct the heightened and particularized review that the *Nixon* standard demands

In concluding that the President was not likely to succeed on his claim that the grand jury subpoena should be set aside, the district court purported to apply an "analytic framework" derived from the Supreme Court's decision in *Nixon*. Op. 70-72. But the court's cursory analysis falls well short of what the *Nixon* standard properly demands when a state criminal tribunal subpoenas the President's personal records, in large part because the court again failed to take full account of the unique status and singular duties of the Presidency.

Most significantly, the district court at no point required the District Attorney to establish a "demonstrated, specific need" for the President's personal records. *Nixon*, 418 U.S. at 713. Rather than evaluate whether the records were "essential" to the grand jury's investigation, the district court concluded that the records should be disclosed merely because they "may" reveal "unlawful conduct by third persons and possibly the President." Op. 72. The court never analyzed, much less found, that the President's personal records were central to the alleged illegal conduct being investigated; that any centrally important information in those records needed to be obtained immediately rather than after the President's term ends; or that such information could not be obtained from another source. Insofar as the President is

the principal focus of this state investigation, requiring the immediate production of his own records is unlikely, absent unusual circumstances, to be essential to the grand jury's investigation, given that the state grand jury may not indict him while he remains in office. *See supra* Part III.A. And insofar as a third party is the focus, the prosecutor would have to establish that the immediate disclosure of the President's personal tax returns was somehow vital to the state grand jury's function of determining whether that third party committed a state crime.

The district court identified a number of factors that it believed could affect whether immediate production of the President's records should be compelled, but then failed to apply those factors. For example, the court noted that the running of the statute of limitations could weigh in favor of immediate disclosure. Op. 62. But the court never found that any applicable statute of limitations would expire before the President's term ends, Op. 72, and it failed to take account of the possibility of tolling. Likewise, to the extent the District Attorney may fear spoliation of evidence (notwithstanding that the President's records are in the custody of a third-party accountant), a preservation order until the President's term comes to an end could suffice to meet the grand jury's needs.

The district court's analysis was flawed in additional respects. The court concluded, for example, that the "burdens and interference the President describes *in this case*" would not "substantially impair the President's ability to perform his constitutional duties." Op. 72 (emphasis added). But the Supreme Court has stressed

25

that courts are not to view the potential burden imposed on the President by a single proceeding in isolation, but rather to evaluate the potential burden on the President of allowing litigation of a particular type to proceed.  *See Fitzgerald*, 457 U.S. at 751-53.  It is not difficult to imagine that a federal court decision permitting a local grand jury to take the unprecedented step of subpoenaing the President's personal records would open the door to additional, burdensome requests.  Indeed, the district court recognized as much.  Op. 27 n.9 (acknowledging that a ruling in the District Attorney's favor "might embolden state-level investigation of future Presidents").

Ultimately, the district court placed near-conclusive weight on the fact that the records sought "relate to a time before [the President] assumed office" and might reveal unlawful conduct by "third persons."  Op. 72.  But the court did nothing to dispel the unavoidable impression that the President is himself at least a focus of this carbon-copied criminal subpoena seeking his personal tax returns and other financial records, if not the principal focus.  *See supra* p. 14.  And regardless, while the criminal investigation of third parties is undoubtedly an important interest that warrants consideration under the *Nixon* standard, it remains the case that this subpoena of the President's personal records raises substantial Article II and Supremacy Clause concerns that the court's perfunctory analysis entirely failed to accommodate.

**D.      This Court should stay enforcement of the subpoena as to the President's records**

For the reasons explained above, the district court erred in concluding that the District Attorney was entitled to immediate production of the President's personal records.  The court's decision should therefore be reversed and further enforcement of the subpoena stayed as to the President's records.

Contrary to the district court's conclusion (Op. 40-43), the President will be irreparably harmed absent a stay, even assuming that there will not be any improper public disclosure of grand jury materials.   If the President were required to comply with state grand jury subpoenas first and litigate their validity second, his entitlement under Article II and the Supremacy Clause to be unburdened by such state criminal process over his personal records would be "effectively lost."  *Cf. Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

## CONCLUSION

The district court's judgment should be reversed, and the court should be ordered to stay enforcement of the state grand jury subpoena as to the President's personal records unless and until, at minimum, the District Attorney makes the required showing of particularized need.

Respectfully submitted,

JOSEPH H. HUNT
    *Assistant Attorney General*

HASHIM M. MOOPPAN
    *Deputy Assistant Attorney General*

MARK R. FREEMAN
SCOTT R. MCINTOSH
*/s/ Gerard Sinzdak*
GERARD SINZDAK
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7242*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-0718*

    *gerard.j.sinzdak@usdoj.gov*

October 2019

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29 and Local Rule 29.1 because it contains 6,963 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Gerard Sinzdak*
Gerard Sinzdak

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Gerard Sinzdak*
Gerard Sinzdak